# EXHIBIT 3



# Transcript of Carolyn Yong, Ph.D.

**Date:** February 21, 2019
**Case:** United States of America -v- US Stem Cell Clinic, LLC, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
www.planetdepos.com

```
 1             IN THE UNITED STATES DISTRICT COURT
 2           FOR THE SOUTHERN DISTRICT OF FLORIDA
 3                  Ft. Lauderdale Division
 4   ---------------------------------X
 5   UNITED STATES OF AMERICA,         :
 6                    Plaintiff,       :
 7   v.                                : Civil Action No.:
 8                                     : 18-61047-CIV
 9   US STEM CELL CLINIC, LLC, ET AL.,:
10                    Defendants.      :
11   ---------------------------------X
12
13         Deposition of CAROLYN YONG, PH.D.
14                  Washington, D.C.
15            Thursday, February 21, 2019
16                     9:02 a.m.
17
18
19
20
21
22
23   Job No.: 230453
24   Pages: 1-256
25   Reported by: Matthew Goldstein, RPR
```

```
1        Deposition of CAROLYN YONG, Ph.D., held at:
2
3
4        Venable LLP
5        600 Massachusetts Avenue, NW
6        Washington, D.C. 20001
7        202.344.8300
8
9
10
11
12       Pursuant to Notice, before Matthew Goldstein,
13   RPR, Notary Public in and for the District of
14   Columbia.
15
16
17
18
19
20
21
22
23
24
25
```

```
 1        A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFF, UNITED STATES OF
 3   AMERICA:
 4   ROGER J. GURAL, ESQUIRE
 5   UNITED STATES DEPARTMENT OF JUSTICE OFFICE OF
 6   CONSUMER LITIGATION
 7   P.O. Box 386
 8   Washington, D.C. 20044
 9   202.307.0174
10
11   ON BEHALF OF THE PLAINTIFF, UNITED STATES OF
12   AMERICA:
13   MICHAEL D. HELBING, ESQUIRE
14   MICHAEL SHANE, ESQUIRE
15   U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
16   OFFICE OF THE GENERAL COUNSEL FOOD AND DRUG
17   DIVISION
18   10903 New Hampshire Avenue
19   Silver Spring, Maryland 20993
20   240.402.6165
21
22
23
24
25
```

Transcript of Carolyn Yong, Ph.D.
Conducted on February 21, 2019    4

```
 1   A P P E A R A N C E S   C O N T I N U E D
 2       ON BEHALF OF THE PLAINTIFF, UNITED STATES OF
 3       AMERICA:
 4       NATALIE N. SANDERS, ESQUIRE
 5       U.S. DEPARTMENT OF JUSTICE CIVIL DIVISION,
 6       450 5th Street, NW
 7       Room 6400 South
 8       Washington, D.C. 20001
 9       202.598.2208
10
11       ON BEHALF OF THE DEFENDANTS, US STEM CELL
12       CLINIC, LLC, ET AL.:
13       STEPHEN R. FREELAND, ESQUIRE
14       TODD H. HALPERN, ESQUIRE
15       MERYL NOLAN, ESQUIRE
16       VENABLE LLP
17       600 Massachusetts Avenue, NW
18       Washington, D.C. 20001
19       202.344.4545
20
21
22
23
24
25
```

Transcript of Carolyn Yong, Ph.D.
Conducted on February 21, 2019　　5

```
 1                  C O N T E N T S

 2     EXAMINATION OF CAROLYN YONG, PH.D.           PAGE

 3

 4     By MR. FREELAND                                 6

 5                    E X H I B I T S

 6                      (Attached)

 7     YONG          DEPOSITION EXHIBIT            PAGE

 8
       Exhibit 1    Second Amended Notice of           6
 9                  Deposition of Dr. Carolyn Yong

10     Exhibit 2    CBER Key Staff Directory          66

11     Exhibit 3    Expert Report of Carolyn Yong,   128
                    Ph.D.
12
       Exhibit 4    Code of Federal Regulations      190
13
       Exhibit 5    Regulatory Considerations for    230
14                  Human Cells, Tissues, and
                    Cellular and Tissue-Based
15                  Products: Minimal Manipulation
                    and Homologous Use
16
       Exhibit 6    Same Surgical Procedure          231
17                  Exception under 21 CFR
                    1271.15(b): Questions and
18                  Answers Regarding the Scope of
                    the Exception
19
       Exhibit 7    Overview of the US Food and      246
20                  Drug Administration Regulatory
                    Process Chapter 77
21
       Exhibit 8    Rebuttal Expert Report of        251
22                  Elliot B. Lander, M.D., FASC

23

24

25
```

```
 1   I would not have enough information to determine
 2   that.
 3         Q.   Enzymatic digestion, what is your
 4   understanding of enzymatic digestion?
 5         A.   It is using an enzyme to disrupt and
 6   digest the structural components -- specifically
 7   of the adipose tissue or in general?
 8         Q.   In this context.
 9         A.   In this context, the enzyme is being
10   used to digest and disrupt the structural
11   component of the adipose tissue which consists of
12   the extracellular matrix, the basement membrane,
13   and the blood vessels.
14         Q.   Does the enzymatic digestion remove fat?
15         A.   Can you clarify what you mean by "remove
16   fat"?
17         Q.   Does enzymatic digestion involve the
18   breakdown of fat?
19         A.   I have not seen what is the result of
20   enzymatic digestion of adipose tissue per
21   Defendants' processing, so I can't say whether or
22   not it disrupts the cells.
23         Q.   3A, "Reconstitute the cellase, custom
24   formation of collagenous clostridium" -- strike
25   that.
```

1    Q.   Well, what's the purpose of the
2    centrifugation?  It's to separate something;
3    right?
4    A.   Correct.
5    Q.   What's the something?
6    A.   They want to separate the cellular --
7    select cellular components of the adipose tissue
8    and the structural components from the other
9    cellular components.
10   Q.   Why are they doing that?
11   A.   Presumably to obtain the cellular
12   product of interest.
13   Q.   You said "presumably."
14        Do you know for sure why they're doing
15   that?
16   A.   It -- the protocol, as I understand, is
17   entitled "Adipose-derived Stem Cell Isolation, A
18   Step-by-Step Guide."
19   Q.   Right.
20        But do you know for sure that's why
21   they're doing that, though?
22   A.   I would assume that the protocol is to
23   isolate adipose-derived stem cells from adipose
24   tissue.
25   Q.   At this point in the process, other than

```
 1        Q.   Dr. Yong, it's true that Steps 1 through
 2   7 that we just went through in your report, they
 3   are all completed during a single visit by the
 4   patient; correct?
 5        A.   I can't say whether all procedures that
 6   were performed were performed in a -- I guess I
 7   would need to know what you mean by "procedure."
 8        Q.   Steps 1 through 7, they're all completed
 9   in one visit, the same visit by the patient.
10        A.   I'm sorry, "by the patient," you mean
11   completed by the --
12        Q.   Is it your understanding that a patient
13   walks into the defendants' facilities, and Steps 1
14   through 7 are completed on that patient before he
15   or she walks out?
16        A.   That is my understanding.
17        Q.   Do you have any evidence that
18   demonstrates that any patient ever walked into the
19   defendants' facilities, and Steps 1 through 7 took
20   more than one visit by the patient?
21        A.   I do not have that information.
22        Q.   You talk in your expert report about
23   minimal manipulation; correct?
24        A.   Yes.  That is one of the criteria that
25   were evaluated.
```

1   communicable disease risks created by the
2   defendants?
3        A.   I do not recall my report specifying
4   specific communicable disease.  However, there are
5   -- that's not the only consideration.  There's the
6   manufacturing steps.  There's so much processing
7   involved that there are safety risks inherent in
8   those manufacturing steps that introduce risks
9   such as contamination.
10       Q.   But you don't know of any specific risks
11  that you identified that the defendants actually
12  created, do you?
13       A.   I don't have that information of all the
14  batch records of every lot that Defendants have
15  ever produced when processing adipose tissue to
16  manufacture the SVF product.
17       Q.   Has there been a single instance where
18  the defendants have contaminated SVF and put it
19  into a patient?
20       A.   Again, I don't have those batch records.
21  I could not speak to whether or not there were
22  instances.
23       Q.   Page 10 of your report, at the very top
24  there you say, "With regard to HCT/Ps from adipose
25  tissue, FDA generally considers the exception at

Transcript of Carolyn Yong, Ph.D.
Conducted on February 21, 2019                 224

```
 1   21 CFR 1271.15(b) to apply only if the HCT/P from
 2   adipose tissue is for autologous use, is removed
 3   and implanted within a single operation, or in a
 4   limited number of predetermined operations in
 5   order to achieve the intended effect and does not
 6   undergo processing steps beyond rinsing, cleansing
 7   or sizing."
 8           Did I read that correctly?
 9      A.   Yes.
10      Q.   You used the word "generally" there
11   again; correct?
12      A.   Correct.
13      Q.   Why did you use "generally"?
14      A.   I did not use "generally."  The agency
15   used "generally."
16      Q.   What do you mean by that?
17      A.   Again, is -- you can't account for all
18   possible scenarios.  Every scenario would have to
19   be analyzed individually.
20      Q.   What does "limited number of
21   predetermined operations" mean?
22      A.   In the context of adipose tissue?
23      Q.   In any context.
24      A.   I believe that when referring to a
25   surgical procedure besides a single operation,
```

1    there are very limited cases where be -- it would
2    not occur in a single operation.
3         Q.   So it could qualify for the same
4    surgical procedure exemption even if it was in
5    multiple operations?
6         A.   It would have to meet the other -- I
7    won't say criterion but conditions.  However, it
8    is very narrow.
9         Q.   What does "limited number" mean, two?
10        A.   That is not defined.
11        Q.   Does it mean three?
12        A.   I can't say that it means a specific
13   number.
14        Q.   It's not defined in the regulation, is
15   it?
16        A.   To my knowledge, it is not.
17        Q.   What does "to achieve the intended
18   effect" mean?
19        A.   In order -- generally speaking, if an
20   HCT/P is administered, there is -- administered to
21   an individual, there is -- you're doing that for a
22   reason, and you want to achieve a certain effect.
23        Q.   Is the source of this statement -- first
24   paragraph at the top of page 10, is that the
25   guidance document we were referencing earlier?

```
 1          A.    Is the source of this paragraph?
 2          Q.    Correct.
 3                Let me ask it a different way.
 4                What's the basis for this paragraph at
 5    the top of page 10 of your report?
 6          A.    It is consistent with FDA's current
 7    thinking.
 8          Q.    Where is that thinking reflected?
 9          A.    Those recommendations have been
10    reflected and articulated in guidance.
11          Q.    Anywhere else?
12          A.    To my recollection, I don't have the
13    preamble or proposed approach in front of me so I
14    can't say if specifically any of this text was --
15          Q.    You can't identify any other support for
16    that paragraph other than the guidance; correct?
17          A.    I think it is a fair interpretation of
18    the regulation.
19          Q.    Why do you say that?
20          A.    The specific case of adipose tissue,
21    there may be an instance where it is removed and
22    implanted within a single operation or a limited
23    number of predetermined operations in order to
24    achieve an effect.
25          Q.    Where do the words "processing steps
```

1   beyond rinsing, cleansing or sizing" appear in
2   1271?
3        A.   To my recollection, I don't believe
4   those are specified in the regulations.
5        Q.   So how can it be a fair reading of the
6   regulation without the guidance to import those
7   words that are missing from the regulation into
8   the regulation?
9        A.   Again, consistent with FDA's current
10  thinking, generally these processing steps, as
11  have been specified here, generally would allow an
12  HCT/P to remain such HCT/P.
13       Q.   So, again, the support for that
14  paragraph is the guidance and the guidance only;
15  correct?
16       A.   While it might be described in the
17  guidance, I wouldn't say that's the only support,
18  but if you're talking about documents --
19       Q.   Where does the FDA tell the public that
20  this is what this means other than in the
21  guidance?
22       A.   I can't recall if FDA ever articulated
23  this specific text to the public.
24       Q.   Other than in the guidance; correct?
25       A.   I can't recollect, because I can't

```
 1  possibly speak to all the communications FDA had
 2  to the public.
 3       Q.   You're not aware of any, right?
 4       A.   I can't specify --
 5       Q.   Right.
 6       A.   -- a specific instance where -- I find
 7  it hard to imagine this would be the first time
 8  this would be articulated.
 9       Q.   You find it hard to imagine that the
10  first time this position was told to the public
11  was in draft guidance published to the industry?
12       A.   I can't speak on behalf of the agency,
13  but I do think that this language is consistent
14  with how the agency is approaching the same
15  surgical procedure exception.
16       Q.   As reflected where?
17       A.   The draft guidances were drafted and
18  issued to help stakeholders understand FDA's
19  current thinking on same surgical procedure
20  exception.
21       Q.   And before the draft guidance was
22  issued, had FDA ever told the public this sentence
23  at the top of page 10 of your report?
24            MR. GURAL:  Asked and answered.
25            THE WITNESS:  I can't say specifically.
```

1    I can't possibly know all the communications that
2    the agency had with the public.
3    BY MR. FREELAND:
4         Q.   You can't identify one then; right?
5              MR. GURAL:  Asked and answered.
6              THE WITNESS:  Specifically in my time at
7    FDA the guidances were in draft.  I can't speak to
8    the time prior to the issuance of the guidance.
9    BY MR. FREELAND:
10        Q.   What does "rinsing" mean?
11        A.   I don't believe there's a regulatory
12   definition for "rinsing," but I would interpret
13   that as akin to washed.
14        Q.   Does it mean anything else?
15        A.   I can't say if it means anything else.
16        Q.   What does "cleansing" mean?
17        A.   I think how anybody else would interpret
18   "cleansing," cleaning, removing debris.
19        Q.   Does it mean anything else?
20        A.   I can't deny that it can.
21        Q.   The definition that you just gave of
22   "cleansing," is that in the regulations anywhere.
23        A.   I don't recall that "cleansing" is in
24   the regulations.
25        Q.   What does "sizing" mean?