**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**

**CASE NO.: 18-61047-CIV-UNGARO/O'SULLIVAN**

| |
|---|
| **UNITED STATES OF AMERICA,** |
| **Plaintiff,** |
| **v.** |
| **US STEM CELL CLINIC, LLC, a Florida limited liability company,** <br> **US STEM CELL, INC., a Florida profit corporation, and** <br> **KRISTIN C. COMELLA, individual,** |
| **Defendants.** |

**JOINT PRETRIAL STIPULATION**

Pursuant to LR 16.1(e), Plaintiff United States of America and Defendants US Stem Cell Clinic, LLC ("USSCC"), US Stem Cell, Inc., and individual Kristin C. Comella (collectively, "Defendants") hereby file the following Joint Pretrial Stipulation.

**STATEMENTS OF THE CASE**

1. Plaintiff's Statement of the Case

Defendants manufacture an illegal, unproven new drug and inject it into patients, purportedly to treat a wide range of diseases and conditions.  Without FDA license or approval, Defendants recover adipose tissue (fat) from a patient, process that tissue to isolate select cellular components known as stromal vascular fraction (called "SVF" for short), and then inject the SVF along with another drug component (the "SVF product") into different parts of the patient's body.  In doing so, the Defendants are violating the Federal Food, Drug, and Cosmetic Act ("FDCA"), which makes it illegal to manufacture and sell drugs that are produced without adhering to current good manufacturing practice ("CGMP" in FDA parlance) for producing drugs, and further forbids the manufacture and sale of drugs that do not have labeling that bears adequate directions for use.  Drugs that fail to meet these requirements are "adulterated" and

"misbranded," respectively.  Defendants are violating both of these provisions and should be enjoined.

In marketing their drug, Defendants make a host of extravagant, unsubstantiated claims about their product, including that it can treat a variety of serious diseases and conditions, such as amyotrophic lateral sclerosis, Parkinson's disease, spinal cord injuries, stroke, traumatic brain injury, chronic obstructive pulmonary disease, lung disease, and diabetes.  As noted in the New England Journal of Medicine, Defendants' conduct amounts to, in effect, experimentation on patients with the potential for "devastating outcomes."  And that potential is very real. Defendants' SVF product has been associated with serious adverse events, such as blindness and vision impairment.  And even when such calamities are avoided, Defendants' marketing gives unsubstantiated hope to people suffering from serious and sometimes life-threatening conditions. Patients who believe Defendants' claims may forgo proven treatments in favor of expending time and money on Defendants' unapproved product—something Defendants have not shown is either safe or effective.

As noted above, Defendants are violating the FDCA in two basic ways.  *First*, Defendants' SVF product is adulterated because Defendants are not abiding by CGMP.  FDA inspections of USSCC in 2015 and 2017 revealed serious and obvious CGMP violations by USSCC.  CGMP requirements are designed to ensure that drugs (including biological products) have the identity, strength, quality, purity, and other attributes for safe and effective use.  Here, the evidence shows that Defendants violated CGMP by failing to aseptically process their SVF product to prevent microbiological contamination or test the product for sterility and for the presence of endotoxins (which can cause fevers and other health complications), among other violations.  Because Defendants' SVF product is not manufactured, processed, packed, or held in compliance with CGMP, it is adulterated.  *See* 21 U.S.C. § 351(a)(2)(B).

*Second*, Defendants' SVF product is misbranded.  Under 21 U.S.C. § 352(f)(1), a drug's labeling must bear adequate directions for use.  If it does not, the drug is misbranded. Specifically: (1) the SVF product does not bear labeling that contains information required for adequate directions for use, as defined in 21 C.F.R. § 201.5; (2) the SVF product is an unapproved prescription drug that is not excepted from labeling requirements requiring directions under which a lay person can use the drug safely; and (3) it is currently impossible to

draft adequate directions for use because there is no scientifically valid evidence to show that the SVF product is safe or effective for any indication.

Defendants do not dispute the evidence of these violations. Defendants admit that they use their SVF product to address patients' symptoms of neurological, autoimmune, orthopedic, and degenerative diseases and conditions, which makes it a "drug" under the FDCA. *See* 21 U.S.C. § 321(g)(1)(B), (C) ("drug" includes all articles "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease" or "intended to affect the structure or any function of the body of man or other animals."). Defendants admit that FDA's 2015 and 2017 inspections of USSCC found that their manufacture of the SVF product does not comply with CGMP. And Defendants further admit the relevant facts about the labeling of their SVF product and the required information that is missing. Nor is there any question that Defendants' SVF product contains at least one component that has been shipped in interstate commerce. These undisputed facts establish that Defendants' unapproved SVF product is an adulterated and misbranded drug under the FDCA. *See* 21 U.S.C. §§ 351(a)(2)(B) & 352(f)(1).

Based on previous correspondence with FDA, Defendants offer three reasons they believe these basic legal requirements do not apply to them. They claim that (1) their establishment is excepted from FDA regulation under 21 C.F.R. § 1271.15(b) (the "same surgical procedure exception"); (2) their SVF product should not be regulated as a drug or biological product because it meets the criteria at 21 C.F.R. § 1271.10(a) (*i.e.*, minimally manipulated and for homologous use only); and (3) the FDCA does not apply to Defendants at all because Defendants are engaged in the "practice of medicine."

First, the same surgical procedure exception does not apply here because the SVF product—comprised of cells, saline, and perhaps other components left behind from the manufacturing process—implanted into patients is *not* the HCT/P that Defendants remove from patients. What remains of the adipose tissue following Defendants' enzymatic digestion, filtration, centrifugation, and other processing cannot be considered "tissue" at all. Rather, the organized structure of the adipose tissue has been destroyed and all that remains is a heterogeneous collection of cells suspended in a saline solution. The HCT/P that Defendants

3

remove from patients is thus *not* the HCT/P that is later implanted and is accordingly not "such HCT/P's" within the meaning of 21 C.F.R. § 1271.15(b).

Second, as with the same surgical procedure exception, Defendants cannot meet their burden of demonstrating that their SVF product satisfies these criteria for regulation solely under section 361 of the Public Health Service Act ("PHSA") and the regulations in 21 C.F.R. Part 1271. Defendants subject the adipose tissue they recover to processing that far exceeds minimal manipulation and then promote their SVF product for uses that bear no resemblance to the function of adipose tissue in the donor (patient) before it was recovered. The SVF product thus meets neither the "minimally manipulated" nor the "homologous use only" criteria under 21 C.F.R. § 1271.10(a). It is not a "Section 361 HCT/P," but a drug and biological product subject to the FDCA's adulteration and misbranding provisions. *See* 21 C.F.R. § 1271.20; 66 Fed. Reg. at 5458. This is clear on the evidence and the plain text of the regulations discussed above, but even if it were not, FDA's conclusions in this regard would be entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *see also United States v. Regenerative Scis., LLC*, 878 F. Supp. 2d 248, 258 (D.D.C. 2012).

Third, regarding Defendants' argument regarding the practice of medicine, the Court of Appeals for the D.C. Circuit rejected a similar argument in *Regenerative Sciences*, 741 F.3d at 1318. The *Regenerative Sciences* court recognized that the government did not seek to "restrict the use of an autologous stem cell *procedure*," but to enforce the FDCA as it applied to the regulated *article* at issue—*i.e.*, the defendants' misbranded and adulterated stem cell product. *Id.* As with anyone else who manufactures or distributes a drug, the FDCA "appl[ies] to doctors." *Id.*

Defendants are not simply moving fat from one place in a patient's body to another or performing a basic skin graft. They are manufacturing a potentially dangerous, unapproved new drug that is both adulterated and misbranded and they are injecting it into their patients. Defendants refuse to comply with the law, and indeed vigorously dispute that they are subject to the FDA's regulatory authority as they continue to experiment on the public in violation of basic

FDCA requirements.  Permanent injunctive relief is necessary to stop this ongoing violation of law and to protect the public health.

2. Defendants' Statement of the Case

The defendants in this action, US Stem Cell Clinic, LLC, US Stem Cell, Inc., and Dr. Kristin Comella (collectively, the "Defendants") and others pioneered a surgical procedure (the "SVF Surgical Procedure") that harnesses the therapeutic value of a person's own stem cells.  The cells at issue—called stromal vascular fraction ("SVF")—are naturally occurring in a person's fat tissue and have known regenerative properties.  The SVF Surgical Procedure involves nothing more than a qualified, licensed health care professional taking cells from one part of a patient's body and relocating them to another part of the same patient.  The health care professional takes a small amount of fat tissue from the patient, extracts a collection of cells from the tissue, and then places that collection of cells into a syringe along with a saline solution that she injects back into the same patient.  What Plaintiff characterizes as a "drug product" is nothing more than a collection of the patient's own cells suspended in a simple saline solution.

Plaintiff contends that the FDA has the authority to regulate a patient's own cells as a drug, even when used solely for that patient's own benefit upon consultation with a qualified health care professional.  In addition, Plaintiff contends that the FDA may regulate the process employed by the health care professional in obtaining those cells from the patient's fat tissue as drug manufacturing, akin to the mass production of medicines at a pharmaceutical plant and therefore subject to the same legal and regulatory standards.  Plaintiff advances these arguments as a basis for prohibiting Defendants from performing this procedure on a patient, even if:  (1) the patient's physician views it as the best treatment option; (2) the patient has tried all other known treatments to no avail; (3) the patient has provided valid informed consent; and (4) there is no data demonstrating that the procedure presents an unreasonable risk to the patient.

Plaintiff's arguments are predicated on the claim that the surgical procedure employed by Defendants is not exempted from FDA regulation under the "Same Surgical Procedure Exception" ("SSPE"), even though the entire procedure is performed in a single patient visit and completed within a few hours.  This exception, set forth in an FDA regulation, explicitly exempts cells from regulation under the FDCA and PHS Act if the cells are taken from the patient as part of a single surgical procedure.

In 2001, the FDA promulgated a regulatory framework establishing its authority to regulate certain procedures that involve human cells, tissues, or cellular or tissue-based products ("HCT/Ps"). 21 C.F.R. Part 1271. The FDA, however, included an exemption for certain procedures—the SSP Exemption—which excluded from any FDA regulatory authority an "establishment that removes HCT/Ps from an individual and implants such HCT/P's into the same individual during the same surgical procedure." 21 C.F.R. § 1271.15(b).

The Defendants' SVF Surgical Procedure fits within the SSP Exemption. That exemption sets out four basic criteria. Defendants' SVF Surgical Procedure satisfies all four criteria. First, the procedure must involve HCT/Ps, which the regulation defines as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient." 21 C.F.R. § 1271.3(d). Here, the SVF cells are HCT/Ps. Second, the procedure must involve an autologous use—*i.e.*, the procedure must involve transplanting HCT/Ps into the same patient from whom the HCT/Ps were removed. Here, Defendants' SVF Surgical Procedure is an autologous procedure as it involves transplanting the SVF cell population back into the same individual from whom the SVF cells originated. Third, the entire surgical procedure must occur during a single sitting. Here, the Defendants' entire SVF Surgical Procedure takes place within a single surgical procedure in a single facility on a single day.

Finally, the HCT/Ps that are removed from the patient must remain "such" HCT/Ps when transplanted back into the patient. That is exactly what happens in the SVF Surgical Procedure. Specifically, the SVF cells that are put back into the patient are the SVF cells that are initially removed from the patient, thus satisfying the fourth criterion of the SSP Exemption.

Here, the surgical tools utilized in the SVF Surgical Procedure—a digestive enzyme and a centrifuge—have no discernable impact on the SVF cells and certainly do not create entirely new tissue or, for that matter, a "drug." Specifically, the digestive enzyme used in the SVF Surgical Procedure (*i.e*, collagenase), which cleanses and separates the SVF cells from the surrounding fat, does not have any measurable impact on the SVF cells. In fact, scientific studies indicate that the collagenase only affects the collagen matrix of the adipose tissue—not the SVF cells—and certainly does not create tissue. Similarly, the centrifuge used in the SVF Surgical Procedure, which simply separates the SVF cellular components from the fat, does not change or alter the individual SVF cells. In sum, the SVF Surgical Procedure does not change the SVF cells, nor does

it convert the SVF cells into some new substance. Simply stated, the process is by no means "manufacturing," and the results of that process cannot be deemed a "drug."

Because Defendants' SVF Surgical Procedure satisfies all four elements of the SSP Exemption, the procedure is exempt from all regulation by the FDA. Accordingly, the FDA is not entitled to permanent injunctive relief in the instant matter.

If this Court disagrees, however, then, at minimum, Defendants' SVF Surgical Procedure is exempt from regulation under the FDCA and may only be regulated under the PHSA. Specifically, pursuant to FDA regulation, a party and its procedure are regulated only under the PHSA, and exempt from regulation under the FDCA if that party falls within the exemption laid out in Section 1271.10(a) (hereinafter, the "Minimal Manipulation Exception"). 21 C.F.R. § 1271.10(a). Specifically, a party that satisfies the following four criteria is exempt from regulation under the FDCA: (1) the HCT/P is only minimally manipulated; (2) the HCT/P is intended for homologous use (*i.e.*, serves the same basic function both before and after the procedure); (3) the procedure through which the HCT/Ps are isolated does not involve combination with another article; and (4) is for autologous use. *Id.* Because Defendants' SVF Surgical Procedure indisputably satisfies these four criteria, should this Court determine that Defendants' SVF Surgical Procedure is not exempt from all regulation by the FDA under the SSP Exemption, it should find that the SVF Surgical Procedure is exempt from regulation under the FDCA pursuant to the Minimal Manipulation Exception. Consequently, the FDA could not require Defendants to obtain premarket approval of a BLA or NDA in order to market the SVF Surgical Procedure, to perform the SVF Surgical Procedure in compliance with CGMP, or to label the patient's cells as a drug product in accordance with FDA regulations.

## BASIS OF FEDERAL JURISDICTION

Jurisdiction to restrain violations of the FDCA is granted to the district courts of the United States pursuant to 21 U.S.C. § 332(a). This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1345. Venue in this district is proper under 28 U.S.C. §§ 1391(b) and (c).

## PLEADINGS RAISING THE ISSUES

1.  Plaintiff's Complaint (DE 1)
2.  Defendants' Answer to Plaintiff's Complaint (DE 26)

## UNDISPOSED OF MOTIONS REQUIRING ACTION BY THE COURT

1. Plaintiff's Motion for Summary Judgment (DE 42)
2. Defendants' Motion for Summary Judgment (DE 41)
3. Defendants' Motion to Withdrawal Jury Demand
4. Plaintiff's Motion *in Limine*

## STATEMENT OF UNCONTESTED FACTS

1. Defendant US Stem Cell Clinic, LLC, ("USSCC") is a Florida limited liability company founded in 2014, with its principal place of business located at 1290 Weston Road, Suite 203a, Weston, FL 33326, within the jurisdiction of this Court. USSCC is not registered with the United States Food and Drug Administration ("FDA").

2. Certain of USSCC's employees and contractors administer SVF & Saline[1] to the same patient from whom the adipose tissue was recovered.

3. Certain of USSCC's employees and contractors administer SVF & Saline to patients with various neurological, autoimmune, orthopedic, and degenerative medical conditions and/or diseases, including, but not limited to, Amyotrophic Lateral Sclerosis ("ALS"), Parkinson's disease, spinal cord injuries, stroke, traumatic brain injury, chronic obstructive pulmonary disease ("COPD"), lung disease, and diabetes.

4. USSCC's SVF & Saline is administered to patients using a variety of methods, including intravenously or by injection into specific areas of the body.  USSCC isolates SVF from patients' adipose tissue.

5. Under Defendants' current procedures, Defendants recover adipose tissue, including all cellular and structural components thereof, from patients in dedicated examination rooms. The tissue recovery is accomplished by a mini-liposuction procedure, whereby a syringe is used to recover adipose tissue, including all cellular and structural components thereof.

6. Defendants add a digestive enzyme to the tissue to isolate cell components through enzymatic digestion. It also includes an incubation period, several washing steps,

---

[1] The parties disagree on the characterization of the article at issue in this case.  Plaintiff characterizes Defendants' article as the "SVF product" whereas Defendants refer to it as the "SVF procedure." For the purposes of this joint filing, the parties have agreed to refer to it as "SVF & Saline."

centrifugation, and filtration.  Various types of equipment are used, including, but not limited to, syringes, cell wash bags, conical tubes, an incubator, a centrifuge, and a filter. Through this process, many components of the tissue are broken down and discarded.

7. The digestive enzyme used in the SVF isolation digests the extracellular matrix of adipose tissue, allowing for the isolation of the cellular components of the adipose tissue from other parts of the adipose tissue.

8. The centrifuge is used in the SVF isolation to facilitate isolation of select cells (adipocytes) and digested extracellular matrix components from the cells of interest (SVF).

9. The centrifuge used in the SVF isolation does not create a new cell that did not exist in the adipose tissue.

10. The SVF isolated from the remaining components of adipose tissue is suspended in a sterile saline solution.

11. Saline is a crystalloid.

12. USSCC's SVF isolation involves removing adipocytes, as well as other cellular and structural components, from the adipose tissue.

13. Among other things, adipose tissue provides cushioning and support for other tissues in the body, such as the skin and internal organs.  Adipose tissue has the ability to hold its shape and form.

14. Adipose tissue contains an extracellular matrix.

15. Adipose tissue also contains adipocytes and stromal and vascular cells, including adipose stem cells, hematopoietic stem cells, pericytes, endothelial/progenitor cells, white blood cells, and fibroblasts.

16. SVF includes stromal and vascular cells, including adipose stem cells, hematopoietic stem cells, pericytes, endothelial/progenitor cells, white blood cells, and fibroblasts.

17. USSCC patients are administered SVF & Saline on the same day that their adipose tissue, including all cellular and structural components thereof, is recovered.

18. Among other things, the label for Defendants' SVF & Saline lacks indications for use, dosages, routes of administration, and side effects.

19. USSCC's SVF & Saline has not been licensed or approved by FDA.

20. The Defendants have not filed any new drug application ("NDAs") with FDA pursuant to 21 U.S.C. § 355(b) or (j) for Defendants' SVF & Saline.

21. The Defendants have not filed any biologics license applications ("BLAs") with FDA pursuant to 42 U.S.C. § 262 for Defendants' SVF & Saline.

22. There are no Investigational New Drug Applications ("INDs") in effect under 21 U.S.C. § 355(i), for Defendants' SVF & Saline.

23. Defendant US Stem Cell, Inc. is a Florida profit corporation, founded in 1999, with its principal place of business at 13794 Northwest 4th Street, Suite 212, Sunrise, Florida 33325. US Stem Cell, Inc. is registered with the FDA as a human cells, tissues, and cellular and tissue-based product establishment that recovers, screens, tests, packages, processes, stores, labels and distributes somatic cell therapy products.

24. Defendants US Stem Cell, Inc. and Comella provided training to physicians regarding the recovery of adipose tissue from a patient and the isolation of SVF.

25. US Stem Cell, Inc. stores vials of enzyme frozen until it later ships that enzyme to USSCC.

26. US Stem Cell, Inc. receives in interstate commerce cell wash solution that USSCC uses with SVF. When received by US Stem Cell, Inc. from its supplier, the solution is in 1-liter bottles that are labeled "not for human therapeutic use." US Stem Cell, Inc. then aseptically divides the solution into 125mL bottles. US Stem Cell, Inc. provides the cell wash solution to USSCC for use with SVF by transporting it from US Stem Cell, Inc. to USSCC by car, as needed.

27. US Stem Cell, Inc. assembles adipose extraction kits, which are comprised of, among other things, a plastic beaker, syringes, a conical tube, and a filter. As needed, US Stem Cell, Inc. then transports the adipose extraction kits by car to USSCC.

28. Defendant Kristin C. Comella, Ph.D., is the Chief Scientific Officer of both USSCC and US Stem Cell, Inc.  She is responsible for overseeing the daily operations at USSCC, including but not limited to hiring and firing employees. She has stated that she wrote the procedures for SVF in conjunction with physicians and scientists, and she has trained doctors on the extraction, isolation, and clinical applications of SVF.  She performs her duties within the jurisdiction of this Court.

29. Defendant Comella has a Ph.D. in Cell Biology from the University of Panama, but does not have a medical degree and is not a licensed physician.

30. USSCC's website, http://usstemcellclinic.com, states the company "offer[s] a variety of therapies" for some of the most common conditions" including "neurological . . . autoimmune . . . degenerative" and other conditions, including but not limited to, ALS, Parkinson's disease, spinal cord injuries, stroke, traumatic brain injury, rheumatoid arthritis, congestive heart failure, kidney disease, and liver disease.

31. A USSCC brochure provides that "[s]tem cell therapy may promote the regeneration of healthy tissue, bone, or cartilage" and "has proven to be a better alternative for people facing debilitating conditions such as COPD, Degenerative Disc Disease, Osteoarthritis, and many others where traditional medicine fall short of delivering satisfactory results."

32. In a video posted on www.youtube.com ("YouTube") Defendant Kristin Comella, representing US Stem Cell, Inc.'s corporate predecessor Bioheart, Inc., said, "At Bioheart, we focused on utilizing . . . fat-derived stem cells, originally focusing on patients with cardiac indications, patients who have had a heart attack or have developed congestive heart failure, and then have moved into other indications, including things like COPD, or lung disease; things like diabetes or limb ischemia; and also injuries, things like spinal cord injuries and orthopedics." U.S. Stem Cell Clinic: Meet Kristin Comella, https://www.youtube.com/watch?v=1sFYmiwbMZM (last accessed March 9, 2019).

33. Defendants' SVF & Saline is intended for "autologous" use in patients, which means the "implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered."  21 C.F.R. § 1271.3(a).

34. SVF & Saline is a human cell, tissue, or cellular or tissue-based products. 21 C.F.R. § 1271.3(d).

35. Adipose tissue falls within the definition of human cells, tissues, or cellular or tissue-based products. 21 C.F.R. § 1271.3(d).

36. Between December 2015 and April 2017, USSCC used SVF & Saline to treat more than two hundred and fifty patients at USSCC's Florida facility.

37. FDA investigators inspected USSCC's facility in Sunrise, Florida, from April 10-May 11, 2017.  At the close of the inspection, FDA investigators issued a list of inspectional observations ("Form FDA483") to Defendant Kristin Comella.

38. In October and December 2015, FDA investigators conducted inspections at USSCC. The FDA investigators issued a Form 483 to Defendant Comella, and that Defendant Comella sent a written response to the FDA regarding the inspections and responding to the Form 483.

39. In August 2017, USSCC received a Warning Letter from the FDA, and Defendant Comella and the Defendants' legal counsel sent written responses to the Warning Letter. The FDA did not respond until sending a letter dated March 22, 2018 to Defendants' counsel informing Defendants of Plaintiff's intent to initiate this litigation.

40. USSCC receives 0.9% Sodium Chloride Injection, USP that USSCC uses to resuspend SVF, packed in 10 mL vials from McKesson Medical Surgical, Inc., located in Orlando, Florida.

41. The document entitled, "Adipose Derived Stem Cell Isolation: A Step-By-Step Guide" (Waltrip Decl. Att. 12) accurately describes the steps that employees of Defendant USSCC take to obtain and isolate SVF in a form in which it can be administered to patients.

42. US Stem Cell, Inc., receives lyophilized vials of Cellase enzyme in interstate commerce. When received by US Stem Cell, Inc. from its supplier, the enzyme is labeled "research use only."

43. USSCC does not perform bioburden testing of SVF & Saline to check for the presence of objectionable microorganisms.

**STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

Although at least one party considers each of the facts below to be relevant, the parties do not necessarily agree that all of these facts are relevant to the resolution of this case.

1. Whether or not there have been adequate and well-controlled studies performed on SVF & Saline demonstrating that it is safe or effective for any indication.

2. Whether or not there have been adequate and well-controlled studies performed on SVF & Saline on which to base the directions for use.

3. Whether adipose tissue is structural tissue.

4. Whether Defendants' isolation of SVF alters the original relevant characteristics of the adipose tissue, including its extracellular matrix and inherent structural properties that

contribute to the tissue's utility as, for example, cushioning and support for skin or organs.

5. Whether the digestive enzyme used in Defendants' SVF isolation only affects the collagen matrix of the adipose tissue.

6. Whether the digestive enzyme used in Defendants' SVF isolation creates a new or altered cell that did not naturally occur in the adipose tissue.

7. Whether Defendants' SVF isolation alters the relevant biological characteristics of the SVF.

8. Whether Defendants have established and followed written procedures designed to prevent microbiological contamination of drug products purporting to be sterile.

9. Whether Defendants have validated all aseptic and sterilization processes.

10. Whether Defendants conduct laboratory testing of each batch of SVF & Saline.

11. Whether Defendants have established a system for monitoring environmental conditions to prevent contamination during aseptic processing.

12. Whether Defendants have established written procedures for production and process control designed to assure SVF & Saline has the identity, strength, quality and purity it purports or is represented to possess.

13. Whether Defendants have establish laboratory controls that include scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity.

14. Whether Defendants have established and followed adequate written procedures describing in sufficient detail the receipt, identification, storage, handling, sampling testing, and approval or rejection of components and drug product containers and closures

15. Whether FDA's inspection of USSCC from October 22, 2015, through December 7, 2015, revealed at least eleven examples of Defendants' noncompliance with FDA's CGMP regulations.

16. Whether scientific literature documents harmful effects that may occur as a result of administering products from adipose tissue using routes of administration such as those intended for Defendants' SVF & Saline.

17. Whether the 0.9% Sodium Chloride Injection, USP that USSCC uses to resuspend SVF, packed in 10mL vials from McKesson Medical Surgical, Inc., has travelled in interstate commerce from outside the state of Florida.

18. Whether, at the time it is administered to patients, Defendants' SVF & Saline, in the form in which it is administered to patients, contains one or more components that have traveled in interstate commerce from places outside of the State of Florida.

19. Whether Defendants' processing of adipose tissue alters the tissue's physical properties.

20. Whether adipose tissue also has regenerative characteristics.

21. Whether Defendant Comella performs the SVF procedure.

## ISSUES OF LAW ON WHICH THERE IS AGREEMENT

1. Under the FDCA, a "drug" includes any article that is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," 21 U.S.C. § 321(g)(1)(B), or that is "intended to affect the structure or any function of the body," 21 U.S.C. § 321(g)(1)(C).

2. The "intended use" of a product refers, in turn, "to the objective intent of the persons legally responsible for the labeling of drugs," and is determined by such persons' expressions or may be shown, for example, by "labeling claims, advertising matter, or oral or written statements by such persons or their representatives. . . ." 21 C.F.R. § 201.128.

3. The FDCA defines "drug" to include components of a drug.  21 U.S.C. § 321(g)(1)(D).

4. The FDCA prohibits taking any action with respect to a drug "if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being adulterated or misbranded."  21 U.S.C. § 331(k).

5. Under the FDCA, a drug is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with [CGMP] to assure that such drug meets the requirements of [the FDCA] as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to

possess." 21 U.S.C. § 351(a)(2)(B); *see* 21 C.F.R. Parts 210-211 (drugs); 21 C.F.R. Parts 600-680 (additional standards for biological products).

6. A drug is misbranded under the FDCA "unless its labeling bears adequate directions for use" and the drug does not fall within a regulatory exemption from that requirement. 21 U.S.C. § 352(f)(1); *see* 21 C.F.R. § 201.5.

7. 21 C.F.R. § 201.5 provides that directions for use are inadequate unless the drug's labeling contains, among other things: quantity of dose, including the usual quantities for each of the uses for which it is intended and usual quantities for persons of different physical conditions; frequency and duration of administration; time of administration in relation to time of meals, onset of symptoms, and other factors; and route or method of administration.

8. Under the relevant regulations, "adequate directions for use" are "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.

9. 21 C.F.R. § 201.115(a) permits a "new drug" to be exempt from section 352(f)(1) "[t]o the extent . . . such exemption is claimed in an approved" new drug application.

10. The FDCA specifies that a drug is a prescription drug if, due to "its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [the drug] is not safe for use except under the supervision of a practitioner licensed by law to administer such drug . . . ." 21 U.S.C. § 353(b)(1)(A).

11. Under the PHSA, a "biological product" includes any "virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i).

12. A product may be both a drug and a biological product. A product that has been licensed under the PHSA is not required to also have an approved NDA under the FDCA. 42 U.S.C. § 262(j). However, the FDCA's adulteration and misbranding provisions, 21 U.S.C. §§ 351 and 352, apply to biological products. 42 U.S.C. § 262(j).

13. Regulations promulgated under the PHSA apply to human cells, tissues, or cellular or tissue-based products, known as "HCT/P's." 21 C.F.R. § 1271.3(d) (defining HCT/P's as

"articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient.").

14. One exception from 21 C.F.R. Part 1271 applies to "an establishment that removes HCT/P's from an individual and implants such HCT/P's into the same individual during the same surgical procedure" ("same surgical procedure exception").  21 C.F.R. § 1271.15(b).

15. This same surgical procedure exception states that an establishment that removes HCT/P's from an individual and implants such HCT/P's into the same individual during the same surgical procedure is not required to comply with the requirements of 21 C.F.R. Part 1271 and is not subject to FDA regulation under the FDCA (21 U.S.C. § 321 *et seq.*), or the PHSA (42 U.S.C. § 264).  21 C.F.R. § 1271.15(b).

16. HCT/Ps that satisfy the criteria found in 21 C.F.R. § 1271.10(a) are regulated solely under section 361 of the PHSA (42 U.S.C. § 264) and the regulations in 21 C.F.R. Part 1271, and not under the FDCA and section 351 of the PHSA (42 U.S.C. § 262).  *See* 21 C.F.R. § 1271.20.

17. When the exceptions in 21 C.F.R. § 1271.15, do not apply, HCT/P that do not meet all of the criteria in 21 C.F.R. § 1271.10(a) for regulation solely under the PHSA and 21 C.F.R. Part 1271, are regulated as, among other things, drugs and biological products under the provisions of the FDCA and the PHSA, including the adulteration, misbranding, and premarket approval requirements.  21 C.F.R. § 1271.20.

18. The criteria in 21 C.F.R. § 1271.10 include the requirement that the HCT/P be "intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent."  21 C.F.R. § 1271.10(a)(2).

19. "Homologous use" means "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c).

20. The criteria in 21 C.F.R. § 1271.10(a) also include the requirement that the HCT/P be only "minimally manipulated." 21 C.F.R. § 1271.10(a)(1).

21. For structural tissue, "minimal manipulation" means processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement. 21 C.F.R. § 1271.3(f)(1).

22. For cells or nonstructural tissues, "minimal manipulation" means processing that does not alter the relevant biological characteristics of cells or tissues.  21 C.F.R. § 1271.3(f)(2).

23. The criteria in 21 C.F.R. § 1271.10 include that the manufacture of HCT/P not involve the "combination of the cells or tissues with another article, except for water, crystalloids, or a sterilizing, preserving, or storage agent, provided that the addition of water, crystalloids, or the sterilizing, preserving, or storage agent does not raise any new clinical safety concerns with respect to the HCT/P."  21 C.F.R. § 1271.10(a)(3).

24. The criteria in 21 C.F.R. § 1271.10 include, in certain circumstances, that the HCT/P "is for autologous use." 21 C.F.R. § 1271.10(a)(4).

25. Title 21 Part 1271 of the CFR defines "manufacture" to include, without limitation, "any or all steps in the recovery, processing, storage, labeling, packaging, or distribution of any human cell or tissue, and the screening or testing of the cell or tissue donor."  21 C.F.R. § 1271.3(e).

26. USSCC's process for isolating SVF did not comply with Drug CGMP at the time of FDA's October 22, 2015 to December 7, 2015 inspection.

27. USSCC's process for isolating SVF did not comply with Drug CGMP at the time of FDA's April 10, 2017 to May 11, 2017 inspection.

**ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT**

1. Whether Defendants' SVF & Saline is regulated as a drug and biological product under the FDCA and section 351 of the PHSA and is subject to the provisions of the FDCA and the PHSA, including the FDCA's adulteration, misbranding, and premarket approval requirements.  21 C.F.R. § 1271.20.

2. Whether SVF & Saline is a "drug" within the meaning of the FDCA, 21 U.S.C. § 321(g)(1)(B) and (C).

3. Whether medical expertise, licensure, and appropriate training is necessary to administer products by intravenous, subcutaneous, or intramuscular injections.

4. Whether the SVF & Saline is a "prescription drug" within the meaning of 21 U.S.C. § 353(b)(1)(A).

5. Whether labeling for Defendants' SVF & Saline bears adequate directions for use.

6. Whether the SVF & Saline is a "new drug" within the meaning of 21 U.S.C. § 321(p)(1).

7. Whether the SVF & Saline is also a "new drug" within the meaning of 21 U.S.C.
   § 321(p)(2).

8. Whether Defendants' establishment qualifies for the same surgical procedure exception
   pursuant to 21 C.F.R. § 1271.15(b).

9. Whether Defendants' SVF & Saline is a "biological product" within the meaning of the
   PHSA, 42 U.S.C. § 262(i).

10. Whether Defendants' SVF & Saline qualifies for  regulation only under Section 361 of
    the PHSA and 21 C.F.R. Part 1271 pursuant to 21 C.F.R. § 1271.10(a).

11. Whether the Defendants operate the USSCC facility in conformity with CGMP.

12. Whether Defendants' SVF & Saline is adulterated within the meaning of the FDCA,
    21 U.S.C. § 351(a)(2)(B).

13. Whether Defendants' SVF & Saline is misbranded within the meaning of the FDCA,
    21 U.S.C. § 352(f)(1).

14. Whether Defendants violate 21 U.S.C. § 331(k) by causing the adulteration of SVF &
    Saline within the meaning of 21 U.S.C. § 351(a)(2)(B), while it is held for sale after
    shipment of one or more of their components in interstate commerce.

15. Whether Defendants violate 21 U.S.C. § 331(k) by causing the misbranding of SVF &
    Saline within the meaning of 21 U.S.C. § 352(f)(1), while they are held for sale after
    shipment of one or more of their components in interstate commerce.

**LISTS OF TRIAL WITNESSES**

1. Plaintiff's Trial Witnesses

    i. Elizabeth Waltrip (will testify)
      Program Division Director
      U.S. Food and Drug Administration
      Office of Biological Products Operations Division 1
      555 Winderley Place, Suite 200
      Maitland, FL 32751

    ii. Colleen M. Aspinwall (will testify)
      Consumer Safety Officer
      U.S. Food and Drug Administration
      Office of Biological Products Operations Division 1
      1515 N. Federal Highway, Suite 111
      Boca Raton, FL 33432

iii.  Shavon L. Square (may testify)
Consumer Safety Officer
U.S. Food and Drug Administration
Office of Biological Products Operations Division 1
11919 Rockville Pike
Rockville, MD 20852

iv.  Mizanne Lewis (may testify)
Consumer Safety Officer
U.S. Food and Drug Administration
Office of Biological Products Operations Division 1
555 Winderley Place, Suite 200
Maitland, FL 32751

v.  Stacey Rivette (may testify)
Consumer Safety Officer
U.S. Food and Drug Administration
Center for Biologics Evaluation and Research
10903 New Hampshire Avenue
WO71-1102
Silver Spring, MD 20993-0002

vi.  Samantha Pinizzotto (may testify)
Regulatory Officer
U.S. Food and Drug Administration
Office of Biological Products Operations Division 1
Tampa, FL 33618

vii.  Lorie Hannappel (may testify)
Consumer Safety Officer
U.S. Food and Drug Administration
Office of Regulatory Affairs
4040 N. Central
Dallas, TX 75204

viii.  Paul Licata (may testify)
Regulatory Officer
U.S. Food and Drug Administration
Office of Regulatory Affairs
1515 N. Federal Highway, Suite 111
Boca Raton, FL 33432

ix.  William Frederick Lagud, Jr. (may testify)
Consumer Safety Officer
U.S. Food and Drug Administration
Office of Regulatory Affairs

19

Lenexa, KS 66214

    x.   Christopher C. Joneckis, PhD (will testify)
Associate Director for Review Management
U.S. Food and Drug Administration
Center for Biologics Evaluation and Research
Office of the Center Director
10903 New Hampshire Avenue
WO71-7316
Silver Spring, MD 20993-0002

    xi.   EXPERT WITNESS: Carolyn Yong, PhD (will testify)
Associate Director of Policy
U.S. Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Tissues and Advanced Therapies (OTAT)
10903 New Hampshire Avenue
WO71-5238
Silver Spring, MD 20993-0002

    xii.   EXPERT WITNESS: Larissa Lapteva, MD (will testify)
Associate Director
U.S. Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Tissues and Advanced Therapies
Division of Clinical Evaluation, Pharmacology, and Toxicology
10903 New Hampshire Avenue
WO71-5328
Silver Spring, MD 20993-0002

    xiii.   EXPERT WITNESS: Randa F. Melhem, PhD (will testify)
U.S. Food and Drug Administration
Center for Biologics Evaluation and Research
Office of Compliance and Biologics Quality
Division of Manufacturing and Product Quality
10903 New Hampshire Avenue
WO71-6025
Silver Spring, MD 20993-0002

2. Defendants' Trial Witnesses

    *See* Exhibit A hereto.

**ESTIMATED TRIAL TIME**

1. Plaintiff estimates trial will take 5 days.

2. Defendants estimate trial will take 4 days.

## WAIVER OF RIGHT TO TRIAL BY JURY

As Plaintiff has represented that it does not seek monetary relief in the instant action, Defendants intend to file a motion withdrawing their demand for a trial by jury.

## ESTIMATED MAXIMUM ATTORNEY'S FEES ALLOWABLE

1. Plaintiff maintains that fees are not warranted but would be governed by the Equal Access to Justice Act ("EAJA") and relevant case law.

2. Defendants maintain that fees would be governed by the Equal Access to Justice Act ("EAJA") and relevant case law.


DATED: March 29, 2019                    **Respectfully Submitted,**

**JOSEPH H. HUNT**                       **ARIANA FAJARDO ORSHAN**
**Assistant Attorney General**           **UNITED STATES ATTORNEY**

**JAMES M. BURNHAM**                     **JAMES A. WEINKLE**
**Deputy Assistant Attorney General**    **Assistant United States Attorney**
**Civil Division**                       Florida Bar No. 0710891
                                         99 N.E. 4th Street, Suite 300
**GUSTAV W. EYLER**                      Miami, Florida 33132
**Acting Director**                      Tel.: 305.961.9290
**Consumer Protection Branch**           Email: James.Weinkle@usdoj.gov

**ALAN PHELPS**
**Assistant Director**

**ROGER J. GURAL**
**Roger J. Gural**
**Trial Attorney**
Consumer Protection Branch
United States Department of Justice
Washington, DC  20044
P.O. Box 386
Tel.: 202.307.0174
Email: roger.gural@usdoj.gov

*Counsel for United States of America*

**Todd A. Harrison** (admitted pro hac vice)
**Todd H. Halpern** (admitted pro hac vice)
**Stephen R. Freeland** (admitted pro hac vice)
**Mary M. Gardner** (admitted pro hac vice)
**Venable LLP**
600 Massachusetts Avenue NW
Washington, DC 20001

*Attorneys for Defendants US Stem Cell
Clinic, LLC, US Stem Cell, Inc., and
Kristin C. Comella*

**Isaac J. Mitrani**
Florida Bar No. 348538
**Loren H. Cohen**
Florida Bar No. 303879
**MITRANI, RYNOR,
ADAMSKY & TOLAND, P.A.**
301 Arthur Godfrey Road, Penthouse
Miami Beach, FL  33140
Tel.:    305-/358-0050
Fax:    305/358-0050
imitrani@mitrani.com
lcohen@mitrani.com
dbitran@mitrani.com
ctenn@mitrani.com
miamidocketing@mitrani.com