**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION**

**CASE NO.: 18-61047-CIV-UNGARO/O'SULLIVAN**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      v.

**US STEM CELL CLINIC, LLC, a Florida limited liability company,
US STEM CELL, INC., a Florida profit corporation, and
KRISTIN C. COMELLA, individual,**

      **Defendants.**

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Court's Scheduling Order (D.E. 29), Plaintiff United States of America hereby files the following Proposed Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1. Defendant US Stem Cell Clinic, LLC, ("USSCC") is a Florida limited liability company founded in 2014, with its principal place of business located at 1290 Weston Road, Suite 203a, Weston, FL 33326, within the jurisdiction of this Court. USSCC is not registered with the United States Food and Drug Administration ("FDA").

2. Defendants manufacture or cause to be manufactured, their stromal vascular fraction ("SVF") product (the "SVF product") from a patient's adipose tissue (fat) and additional drug components, including saline.

3. USSCC administers its SVF product to the same patient from whom the adipose tissue was recovered.

4. USSCC administers its SVF product to patients with various neurological, autoimmune, orthopedic, and degenerative medical conditions and/or diseases, including, but not limited to, Amyotrophic Lateral Sclerosis ("ALS"), Parkinson's disease, spinal cord

injuries, stroke, traumatic brain injury, chronic obstructive pulmonary disease ("COPD"), lung disease, and diabetes.

5. USSCC's SVF product is administered to patients using a variety of methods, including intravenously or by injection into specific areas of the body.  USSCC's products are manufactured and administered within the jurisdiction of this Court.

6. Under Defendants' current procedures, isolation of SVF involves the recovery of adipose tissue from patients in dedicated examination rooms located at USSCC's facility.  The tissue recovery is accomplished by a mini-liposuction procedure, whereby a syringe is used to recover adipose tissue.

7. Defendants subject the recovered adipose tissue to a process involving the addition of a solution containing an enzyme to isolate cell components through enzymatic digestion. It also includes an incubation period, several washing steps, centrifugation, and filtration. Various types of equipment are used, including, but not limited to, syringes, cell wash bags, conical tubes, an incubator, a centrifuge, and a filter.  Through this process, many components of the tissue are broken down and discarded.

8. The processing of adipose tissue alters the tissue's physical properties.

9. USSCC's processing of adipose tissue involves removing adipocytes from the adipose tissue.

10. Adipose tissue provides cushioning and support for other tissues in the body, such as the skin and internal organs.  Adipose tissue has the ability to hold its shape and form.

11. Adipose tissue contains an extracellular matrix.

12. USSCC patients are administered the SVF product on the day that their adipose tissue is recovered.

13. Among other things, the label for Defendants' SVF product lacks indications for use, dosages, routes of administration, and side effects.

14. USSCC's SVF product has not been licensed or approved by FDA.

15. There are not now, nor have there ever been any approved new drug application ("NDAs") filed with FDA pursuant to 21 U.S.C. § 355(b) or (j) for Defendants' SVF product.

16. There are not now, nor have there ever been any approved biologics license applications ("BLAs") filed with FDA pursuant to 42 U.S.C. § 262 for Defendants' SVF product.

17. There are no Investigational New Drug Applications ("INDs") in effect under 21 U.S.C. § 355(i), for Defendants' SVF product.
18. Defendant US Stem Cell, Inc., is a Florida profit corporation, founded in 1999, with its principal place of business at 13794 Northwest 4th Street, Suite 212, Sunrise, Florida 33325. US Stem Cell, Inc., is registered with the FDA as a human cells, tissues, and cellular and tissue-based product establishment that recovers, screens, tests, packages, processes, stores, labels and distributes somatic cell therapy products that are regulated as drugs or biological drugs.
19. US Stem Cell, Inc., receives in interstate commerce cell wash solution that USSCC uses with SVF. When received by US Stem Cell, Inc., from its supplier, the solution is in 1-liter bottles that are labeled "not for human therapeutic use." US Stem Cell, Inc., then aseptically divides the solution into 125mL bottles. US Stem Cell, Inc., provides the cell wash solution to USSCC for use with SVF by transporting it from US Stem Cell, Inc., to USSCC by car, as needed.
20. US Stem Cell, Inc., assembles adipose extraction kits, which are comprised of, among other things, a plastic beaker, syringes, a conical tube, and a filter. As needed, US Stem Cell, Inc., then transports the adipose extraction kits by car to USSCC for use with SVF.
21. Defendant Kristin C. Comella, Ph.D., is the Chief Scientific Officer of both USSCC and US Stem Cell, Inc.  She is responsible for overseeing the daily operations at USSCC, including but not limited to overseeing patient scheduling, hiring and firing employees and SVF. She has stated that she wrote the procedures for isolating SVF, and she has trained doctors on the extraction, isolation, and clinical applications of SVF.  She performs her duties within the jurisdiction of this Court.
22. Defendant Comella does not have a medical degree and is not a licensed physician.
23. Defendant Theodore Gradel is a minority investor in USSCC.  He has been a "managing member" of USSCC.
24. As of November 13, 2017, Defendant Theodore Gradel was listed with the Florida Division of Corporations as an "authorized person" and a "manager" for USSCC.
25. Defendant Gradel participated on behalf of USSCC in an FDA inspection of USSCC in 2015.

26. Defendant Gradel was identified to FDA investigators as an individual to whom correspondence regarding USSCC should be sent.

27. Defendant Theodore Gradel does not have a medical degree and is not a licensed physician.

28. USSCC's website, http://usstemcellclinic.com, states the company "offer[s] a variety of therapies" for some of the most common conditions" including "neurological . . . autoimmune . . . degenerative" and other conditions, including but not limited to, ALS, Parkinson's disease, spinal cord injuries, stroke, traumatic brain injury, rheumatoid arthritis, congestive heart failure, kidney disease, and liver disease.

29. A USSCC brochure that markets the SVF product, provides that "[s]tem cell therapy may promote the regeneration of healthy tissue, bone, or cartilage" and "has proven to be a better alternative for people facing debilitating conditions such as COPD, Degenerative Disc Disease, Osteoarthritis, and many others where traditional medicine fall short of delivering satisfactory results."

30. In a video posted on www.youtube.com ("YouTube") Defendant Kristin Comella, representing US Stem Cell, Inc.'s, corporate predecessor Bioheart, Inc., said, "At Bioheart, we focused on utilizing . . . fat-derived stem cells, originally focusing on patients with cardiac indications, patients who have had a heart attack or have developed congestive heart failure, and then have moved into other indications, including things like COPD, or lung disease; things like diabetes or limb ischemia; and also injuries, things like spinal cord injuries and orthopedics." U.S. Stem Cell Clinic: Meet Kristin Comella, https://www.youtube.com/watch?v=1sFYmiwbMZM (last accessed March 9, 2019).

31. Defendants' SVF product is intended for "autologous" use in patients, which means the "implantation, transplantation, infusion, or transfer of human cells or tissue back into the individual from whom the cells or tissue were recovered." 21 C.F.R. § 1271.3(a).

32. Between December 2015 and April 2017, USSCC used the SVF product to treat more than two hundred and fifty patients at USSCC's Sunrise, Florida facility.

33. USSCC's SVF process for manufacturing the SVF product did not comply with Drug CGMP at the time of FDA's October 22, 2015 to December 7, 2015 inspection.

4

34. FDA's inspection of USSCC from October 22, 2015, through December 7, 2015, revealed at least eleven examples of Defendants' noncompliance with FDA's CGMP regulations.
35. At the close of the 2015 inspection, FDA investigators issued a Form 483 to Defendant Comella.
36. Defendant Comella sent a written response to the FDA responding to the Form 483 issued at the end of the 2015 inspection.
37. USSCC's SVF process for manufacturing the SVF product did not comply with Drug CGMP at the time of FDA's April 10, 2017 to May 11, 2017 inspection.
38. FDA's inspection of USSCC from April 10, 2017 through May 11, 2017, revealed at least twelve examples of Defendants' noncompliance with FDA's CGMP regulations.
39. At the close of the 2017 inspection, FDA investigators issued a list of inspectional observations ("Form FDA483") to Defendant Kristin Comella.
40. Defendant Comella sent a written response to the FDA responding to the Form 483 issued at the end of the 2017 inspection.
41. Defendants have not established and followed written procedures designed to prevent microbiological contamination of drug products purporting to be sterile.
42. Defendants have not validated all aseptic and sterilization processes.
43. Defendants do not conduct laboratory testing of each batch of SVF product.
44. USSCC does not perform bioburden testing of the SVF product to check for the presence of objectionable microorganisms.
45. Defendants have not established a system for monitoring environmental conditions to prevent contamination during aseptic processing.
46. Defendants have not established written procedures for production and process control designed to assure the SVF product has the identity, strength, quality and purity it purports or is represented to possess.
47. Defendants have not established laboratory controls that include scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity.

48. Defendants have not established and followed adequate written procedures describing in sufficient detail the receipt, identification, storage, handling, sampling testing, and approval or rejection of components and drug product containers and closures
49. In August 2017, FDA sent a Warning Letter to USSCC, and Defendant Comella and the Defendants' legal counsel sent written responses to the Warning Letter.
50. USSCC receives 0.9% Sodium Chloride Injection, USP that USSCC uses to manufacture its SVF product, packed in 10 mL vials from McKesson Medical Surgical, Inc., located in Orlando, Florida.
51. The 0.9% Sodium Chloride Injection, USP that USSCC uses to manufacture its SVF product, packed in 10mL vials from McKesson Medical Surgical, Inc., has travelled in interstate commerce from outside the state of Florida.
52. The cellase enzyme Defendants use in the manufacture of the SVF product has traveled in interstate commerce.
53. Defendants' SVF product, in the form in which it is administered to patients, contains one or more components, such as 0.9% sodium chloride injection, cell wash solution, or cellase enzyme, that have traveled in interstate commerce from places outside of the State of Florida.
54. The document entitled, "Adipose Derived Stem Cell Isolation: A Step-By-Step Guide" (Waltrip Decl. Att. 12) accurately describes the steps that employees of Defendant USSCC take to obtain and isolate SVF in a form in which it can be administered to patients.
55. US Stem Cell, Inc., receives lyophilized vials of Cellase enzyme in interstate commerce. When received by US Stem Cell, Inc., from its supplier, the enzyme is labeled "research use only."
56. Defendants use the Cellase enzyme as part of their process for manufacturing the SVF product.
57. There have been no adequate and well-controlled studies performed on the SVF product demonstrating that it is safe or effective for any indication.
58. There have been no adequate and well-controlled studies performed on the SVF product on which to base the directions for use.
59. Adipose tissue is structural tissue.

60. Defendants' process for manufacturing the SVF product alters the original relevant characteristics of the adipose tissue, including its extracellular matrix and inherent structural properties that contribute to the tissue's utility as, for example, cushioning and support for skin or organs.
61. Scientific literature documents the harmful effects that may occur as a result of administering products from adipose tissue using routes of administration such as those intended for Defendants' SVF product.
62. Defendants are likely to continue to violate the FDCA in the absence of an injunction.

## CONCLUSIONS OF LAW

1. Under the FDCA, a "drug" includes any article that is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," 21 U.S.C. § 321(g)(1)(B), or that is "intended to affect the structure or any function of the body," 21 U.S.C. § 321(g)(1)(C).
2. The FDCA defines "drug" to include components of a drug. 21 U.S.C. § 321(g)(1)(D).
3. The "intended use" of a product refers, in turn, "to the objective intent of the persons legally responsible for the labeling of drugs," and is determined by such persons' expressions or may be shown, for example, by "labeling claims, advertising matter, or oral or written statements by such persons or their representatives. . . ." 21 C.F.R. § 201.128.
4. The FDCA prohibits taking any action with respect to a drug "if such act is done while such article is held for sale . . . after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k).
5. Under the FDCA, a drug is adulterated if "the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with [CGMP] to assure that such drug meets the requirements of [the FDCA] as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(2)(B); *see* 21 C.F.R. Parts 210-211 (drugs); 21 C.F.R. Parts 600-680 (additional standards for biological products).
6. A drug is misbranded under the FDCA "unless its labeling bears adequate directions for use" and the drug does not fall within a regulatory exemption from that requirement. 21 U.S.C. § 352(f)(1); *see* 21 C.F.R. § 201.5.

7

7. 21 C.F.R. § 201.5 provides that directions for use are inadequate unless the drug's labeling contains, among other things: quantity of dose, including the usual quantities for each of the uses for which it is intended and usual quantities for persons of different physical conditions; frequency and duration of administration; time of administration in relation to time of meals, onset of symptoms, and other factors; and route or method of administration.

8. Under the relevant regulations, "adequate directions for use" are "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5.

9. 21 C.F.R. § 201.115(a) permits a "new drug" to be exempt from section 352(f)(1) "[t]o the extent . . . such exemption is claimed in an approved" new drug application.

10. The FDCA specifies that a drug is a prescription drug if, due to "its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [the drug] is not safe for use except under the supervision of a practitioner licensed by law to administer such drug . . . ." 21 U.S.C. § 353(b)(1)(A).

11. Under the PHSA, a "biological product" includes any "virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide), or analogous product . . . applicable to the prevention, treatment, or cure of a disease or condition of human beings." 42 U.S.C. § 262(i).

12. A product may be both a drug and a biological product. A product that has been licensed under the PHSA is not required to also have an approved NDA under the FDCA. 42 U.S.C. § 262(j). However, the FDCA's adulteration and misbranding provisions, 21 U.S.C. §§ 351 and 352, apply to biological products. 42 U.S.C. § 262(j).

13. Regulations promulgated under the PHSA apply to human cells, tissues, or cellular or tissue-based products, known as "HCT/P's." 21 C.F.R. § 1271.3(d) (defining HCT/P's as "articles containing or consisting of human cells or tissues that are intended for implantation, transplantation, infusion, or transfer into a human recipient.").

14. The criteria found in 21 C.F.R. § 1271.10(a) distinguish those HCT/P's regulated solely under section 361 of the PHSA (42 U.S.C. § 264) and the regulations in 21 C.F.R. Part

1271 from those HCT/P's regulated as drugs and biological products under the FDCA and section 351 of the PHSA (42 U.S.C. § 262).  *See* 21 C.F.R. § 1271.20.

15. An establishment that removes HCT/P's from an individual and implants such HCT/P's into the same individual during the same surgical procedure is not required to comply with the requirements of 21 C.F.R. Part 1271. 21 C.F.R. § 1271.15(b).

16. HCT/P's that do not fall within one of the exceptions in 21 C.F.R. § 1271.15, and do not meet all of the criteria in 21 C.F.R. § 1271.10(a) for regulation solely under the PHSA and 21 C.F.R. Part 1271, are regulated as, among other things, drugs and biological products under the provisions of the FDCA and the PHSA, including the adulteration, misbranding, and premarket approval requirements.  21 C.F.R. § 1271.20.

17. The criteria in 21 C.F.R. § 1271.10 include the requirement that the HCT/P be "intended for homologous use only, as reflected by the labeling, advertising, or other indications of the manufacturer's objective intent."  21 C.F.R. § 1271.10(a)(2).

18. "Homologous use" means "the repair, reconstruction, replacement, or supplementation of a recipient's cells or tissues with an HCT/P that performs the same basic function or functions in the recipient as in the donor." 21 C.F.R. § 1271.3(c).

19. The criteria in 21 C.F.R. § 1271.10(a) also include the requirement that the HCT/P be only "minimally manipulated." 21 C.F.R. § 1271.10(a)(1).

20. For structural tissue, "minimal manipulation" means processing that does not alter the original relevant characteristics of the tissue relating to the tissue's utility for reconstruction, repair, or replacement. 21 C.F.R. § 1271.3(f)(1).

21. One exception from 21 C.F.R. Part 1271 applies to "an establishment that removes HCT/P's from an individual and implants such HCT/P's into the same individual during the same surgical procedure" ("same surgical procedure exception").  21 C.F.R. § 1271.15(b).

22. Title 21 Part 1271 defines "manufacture" to include, without limitation, "any or all steps in the recovery, processing, storage, labeling, packaging, or distribution of any human cell or tissue, and the screening or testing of the cell or tissue donor."  21 C.F.R. § 1271.3(e).

23. Medical expertise, licensure, and appropriate training is necessary to administer products by intravenous, subcutaneous, or intramuscular injections.

24. Defendants' SVF product is regulated as a drug and biological product under the FDCA and section 351 of the PHSA and is subject to the provisions of the FDCA and the PHSA, including the FDCA's adulteration, misbranding, and premarket approval requirements. 21 C.F.R. § 1271.20.

25. The SVF product is a "drug" within the meaning of the FDCA, 21 U.S.C. § 321(g)(1)(B) and (C), because Defendants' records, public statements, and information contained on Defendants' websites and elsewhere establish that the USSCC product is intended to be used in the cure, mitigation, or treatment of diseases in man and/or to affect the structure and function of the body.

26. The SVF product is a "prescription drug" within the meaning of 21 U.S.C. § 353(b)(1)(A) because, due to its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, it is not safe for use except under the supervision of a practitioner licensed by law to administer such drug.

27. The SVF product is a prescription drug because the intended method of using the SVF product requires medical training.

28. The SVF product is a prescription drug because the potential for harmful effects means the SVF product is not safe for use except under the supervision of a practitioner licensed by law to administer such a drug.

29. The SVF product is a "new drug" within the meaning of 21 U.S.C. § 321(p)(1), because it is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.

30. The SVF product is also a "new drug" within the meaning of 21 U.S.C. § 321(p)(2), because it has not been used to a material extent or for a material time under the conditions prescribed, recommended, or suggested in its labeling.

31. The SVF product does not contain adequate directions for use as defined in 21 C.F.R. § 201.5.

32. The SVF product does not qualify for an exemption from 21 U.S.C. § 352(f)(1).

33. The labeling for Defendants' SVF product does not bear adequate directions for use.

34. Defendants' SVF product is a "biological product" within the meaning of the PHSA, 42 U.S.C. § 262(i), because it is an "analogous product," within the meaning of that

section, that is "applicable to the prevention, treatment, or cure of a disease or condition of human beings."

35. Defendants' establishment does not qualify for the same surgical procedure exception in 21 C.F.R. § 1271.15(b) because, among other things, the adipose tissue recovered from individuals is subjected to processing rendering Defendants' SVF product no longer "such HCT/P's" removed from the patient, but a collection of cellular components isolated from adipose tissue.

36. Defendants' SVF product does not qualify for regulation only under Section 361 of the PHSA and 21 C.F.R. Part 1271 pursuant to 21 C.F.R. § 1271.10(a), because it is not intended for homologous use, and it is more than minimally manipulated.

37. FDA's inspection of USSCC's facility in Sunrise, Florida, from April 10-May 11, 2017, showed that the methods used in, and the facilities and controls used for, the manufacture, processing, packing, and holding of Defendants' SVF product do not conform to and are not operated or administered in conformity with CGMP.

38. The CGMP violations observed during FDA's 2017 inspection included the following:
    a. Failure to establish and follow appropriate written procedures designed to prevent microbiological contamination of drug products purporting to be sterile, including validation of all aseptic and sterilization processes, as required by 21 C.F.R. § 211.113(b).
    b. Failure to conduct appropriate laboratory testing, as necessary, of each batch of drug product required to be free of objectionable microorganisms, as required by 21 C.F.R. § 211.165(b).
    c. Failure to establish a system for monitoring environmental conditions to prevent contamination during aseptic processing, as required by 21 C.F.R. § 211.42(c)(10)(iv).
    d. Failure to establish written procedures for production and process control designed to assure the drug products have the identity, strength, quality and purity they purport or are represented to possess, as required by 21 C.F.R. § 211.100(a).
    e. Failure to establish laboratory controls that include scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials,

      labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity, as required by 21 C.F.R. § 211.160(b).

    f.    Failure to establish and follow adequate written procedures describing in sufficient detail the receipt, identification, storage, handling, sampling testing, and approval or rejection of components and drug product containers and closures, as required by 21 C.F.R. § 211.80(a).

39. The methods used in, and the facilities and controls used for, the manufacture, processing, packing, and holding of Defendants' SVF product do not conform to and are not operated or administered in conformity with CGMP. *See* 21 U.S.C. § 351(a)(2)(B) and 21 C.F.R. Parts 210-211; *see also* 21 C.F.R. Parts 600-680 (setting forth additional standards and manufacturing requirements applicable to biological products).

40. Defendants' SVF product is adulterated within the meaning of the FDCA, 21 U.S.C. § 351(a)(2)(B) because Defendants do not manufacture their SVF product in a manner that conforms to CGMP.

41. Defendants' SVF product is misbranded within the meaning of the FDCA, 21 U.S.C. § 352(f)(1), because it is a drug and its labeling fails to bear adequate directions for use, and because it is not exempt from the requirements of 21 U.S.C. § 352(f)(1).

42. Defendants violate 21 U.S.C. § 331(k) by causing the adulteration of the SVF product within the meaning of 21 U.S.C. § 351(a)(2)(B), while it is held for sale after shipment of one or more of their components in interstate commerce.

43. Defendants violate 21 U.S.C. § 331(k) by causing the misbranding of the SVF product within the meaning of 21 U.S.C. § 352(f)(1), while they are held for sale after shipment of one or more of their components in interstate commerce.

44. An injunction is necessary because there is a likelihood that Defendants will continue to violate the FDCA in the absence of an injunction.

DATED: March 29, 2019                         **Respectfully Submitted,**

**JOSEPH H. HUNT**                                   **ARIANA FAJARDO ORSHAN**
Assistant Attorney General                      **UNITED STATES ATTORNEY**

**JAMES M. BURNHAM**
**Deputy Assistant Attorney General**
**Civil Division**

**GUSTAV W. EYLER**
**Acting Director**
**Consumer Protection Branch**

**ALAN PHELPS**
**Assistant Director**

**ROGER J. GURAL**
**Roger J. Gural**
**Trial Attorney**
Consumer Protection Branch
United States Department of Justice
Washington, DC  20044
P.O. Box 386
Tel.: 202.307.0174
Email: roger.gural@usdoj.gov

*Counsel for United States of America*

**JAMES A. WEINKLE**
**Assistant United States Attorney**
Florida Bar No. 0710891
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
Tel.: 305.961.9290
Email: James.Weinkle@usdoj.gov